IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRCT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| JAMES CLYDE BORAWSKI, | ) | CASE NO.  1:20-CV-01091-JDG |
| | ) | |
| Plaintiff, | ) | |
| | ) | MAGISTRATE JUDGE |
| vs. | ) | JONATHAN D. GREENBERG |
| | ) | |
| COMMISSIONER OF SOCIAL | ) | **MEMORANDUM OF OPINION AND** |
| SECURITY, | ) | **ORDER** |
| Defendant, | ) | |
| | ) | |

Plaintiff, James Clyde Borawski ("Plaintiff" or "Borawski"), challenges the final decision of

Defendant, Andrew Saul,[1] Commissioner of Social Security ("Commissioner"), denying his application

for a Period of Disability ("POD") and Disability Insurance Benefits ("DIB") under Title II of the Social

Security Act,42 U.S.C. §§ 416(i), 423, and 1381 *et seq.* ("Act").  This Court has jurisdiction pursuant to

42 U.S.C. § 405(g) and the consent of the parties, pursuant to 28 U.S.C. § 636(c)(2).  For the reasons set

forth below, the Commissioner's final decision is AFFIRMED.

## I.    PROCEDURAL HISTORY

In January 2017, Borawski filed an application for POD and DIB, alleging a disability onset date

of June 9, 2016,[2] and claiming he was disabled due to back injury, restless leg syndrome, periodic limb

movement disorder, and sleep apnea.  (Transcript ("Tr.") at 12, 79.)  The application was denied initially

---

[1] On June 17, 2019, Andrew Saul became the Commissioner of Social Security.

[2] At the hearing, counsel for Borawski moved to amend the disability onset date to January 1, 2018 – the
same month Borawski turned 50 – if the ALJ issued a fully favorable decision, but not if the ALJ issued
any less than a fully favorable decision.  (Transcript ("Tr.") at 74, 77.)  Counsel filed a Motion to Amend
the Alleged Onset Date after the hearing (*id.* at 12), which the ALJ denied as she issued an unfavorable
decision.  (*Id.* at 16.)

1

and upon reconsideration, and Borawski requested a hearing before an administrative law judge ("ALJ"). (*Id.* at 12.)

On February 4, 2019, an ALJ held a hearing, during which Borawski, represented by counsel, and an impartial vocational expert ("VE") testified. (*Id.* at 12.) On June 5, 2019, the ALJ issued a written decision finding Plaintiff was not disabled. (*Id.* at 12-31.) The ALJ' s decision became final on March 19, 2020, when the Appeals Council declined further review. (*Id.* at 1-6.)

On May 19, 2020, Borawski filed his Complaint to challenge the Commissioner's final decision. (Doc. No. 1.) The parties have completed briefing in this case. (Doc. Nos. 16, 19.) Borawski asserts the following assignment of error:

> (1) The ALJ's RFC finding is not supported by substantial evidence; she improperly discredited key limitations established by the record, in particular Plaintiff's need to use a cane, as well as mental limitations assessed by the Agency's own experts.

(Doc. No. 16 at 1.)

## II. EVIDENCE

### A. Personal and Vocational Evidence

Borawski was born in January 1968 and was 51 years-old at the time of his administrative hearing (Tr. 12, 50, 79), making him a "person closely approaching advanced age" under Social Security regulations. *See* 20 C.F.R. § 404.1563(d). He has at least a high school education and is able to communicate in English. (Tr. 40.) He has past relevant work as a medical laboratory technician and a truck driver. (*Id.* at 30.)

### B. Relevant Medical Evidence[3]

On January 16, 2017, Borawski saw Mark McLoney, M.D., for a new patient appointment to establish care and with complaints of low back pain. (Tr. 262.) Borawski described his low back pain as

---

[3] The Court's recitation of the medical evidence is not intended to be exhaustive and is limited to the evidence cited in the parties' Briefs.

"dull" and "hot," with sciatica down his left leg and weakness in his left leg.  (*Id.* at 263.)  Borawski told Dr. McLoney he had pins and needles in both legs.  (*Id.*)  Borawski reported seeing a chiropractor.  (*Id.*)  Borawski stated he had quit work in June because of his back.  (*Id.*)  Borawski told Dr. McLoney standing and walking made his low back pain and sciatica down his left leg worse, while sitting eased his pain.  (*Id.*)  Bending forward also alleviated the pain.  (*Id.*)  Borawski said he was unable to lay on his back.  (*Id.*)  Borawski also complained of right shoulder pain and told Dr. McLoney he had a pinched nerve.  (*Id.*)  Borawski also relayed diagnoses of sleep apnea, for which he used a CPAP machine, and restless leg syndrome, for which he claimed "nothing worked."  (*Id.*)   On examination, Dr. McLoney found no edema, no deformity or scoliosis of the spine, no tenderness, no instability, and no atrophy or abnormal strength or tone.  (*Id.* at 264.)  Dr. McLoney also found decreased grip strength in the left hand and that Borawski was unable to lift his right arm or perform posterior extension because of discomfort.  (*Id.*)  Borawski demonstrated a limping gait, favoring his left leg.  (*Id.*)  Dr. McLoney found Borawski alert and cooperative, with a normal mood, affect, attention span, and concentration.  (*Id.*)  Dr. McLoney ordered an x-ray of Borawski's right shoulder and referred him to physical therapy for treatment of his shoulder.  (*Id.* at 265.)

A right shoulder x-ray taken that same day revealed "no acute fracture or dislocation," well-preserved joint spaces, and unremarkable soft tissues.  (*Id.* at 267.)  The x-ray also revealed "mild spurring of the distal end of the clavicle at the AC joint."  (*Id.*)

On February 7, 2017, Borawski saw Michael Kelly, M.D., for a spine consult and to establish care.  (*Id.* at 274.)  Borawski complained of low back pain that radiated into his lower extremities, as well as right shoulder pain.  (*Id.*)  Borawski told Dr. Kelly his low back pain and left posterior thigh pain had occurred over the past "30+ years."  (*Id.*)  Borawski rated his low back and leg pain as a 4/10.  (*Id.* at 275.)  Borawski also complained of a "'pins & needles'" feeling that started at his toes and moved up his thighs

bilaterally, which was constant.  (*Id.* at 274.)  Borawski denied unsteadiness and any gait/imbalance concerns, falls, and hand dysfunction.  (*Id.*)  Borawski also reported right shoulder pain that stemmed from a motorcycle accident in 2009 but denied any upper extremity radiculopathy.  (*Id.*)  Borawski also relayed diagnoses of restless leg syndrome and periodic limb disorder.  (*Id.*)  Dr. Kelly noted Borawski's low back and radicular symptoms were "equally concerning."  (*Id.*)  On examination, Dr. Kelly found full 5/5 strength in the upper and lower extremities, intact sensation to light touch, normal reflexes, and negative straight leg raise testing.  (*Id.* at 276.)  Dr. Kelly observed that Borawski had an antalgic gait and "lots of low back pain with movement" during the straight leg raise test.  (*Id.*)  Dr. Kelly reviewed a December 2016 MRI that he noted was a "poor quality image" but revealed "congenital canal stenosis" and "slight disc protrusions at L4/5 and L5/S1 with stenosis."  (*Id.* at 277.)  Dr. Kelly noted Borawski's "major problem [was] axial low back pain in the setting of 30+ years of symptoms and chronic pain picture."  (*Id.*)  Dr. Kelly recommended a pain management evaluation and management, noting Borawski already had an appointment scheduled.  (*Id.*)  Dr. Kelly did not recommend surgery at that time.  (*Id.*)

On February 14, 2017, Michael Kieklak, D.C., issued an opinion regarding Borawski's physical limitations.  (*Id.* at 288.)  Kieklak stated Borawski suffered from "severe low back pain," muscle weakness at "+4" with flexion and extension of the lumbar spine, and pain radiating into his legs bilaterally.  (*Id.*)  Kieklak found Borawski's range of motion was limited, with lumbar flexion to 20 degrees and extension to five degrees.  (*Id.*)  Kieklak described Borawski's gait as "guarded" and antalgic to the left.  (*Id.*)  Kieklak noted no ambulatory aid was used.  (*Id.*)  Kieklak stated Borawski's symptoms had persisted since starting therapy.  (*Id.*)  While Borawski responded favorably to treatment, he did not go in for treatment on a regular basis.  (*Id.*)  Kieklak opined Borawski could not stand for periods of time and it was difficult for him to walk long distances.  (*Id.*)  Borawski underwent chiropractic treatment with Kieklak from June 2015 through February 2017.  (*Id.*)

4

On March 1, 2017, Borawski saw Samuel Rosenberg, M.D., for follow up after not having seen him for quite some time.  (*Id.* at 323-24.)  Borawski complained of "severe back and left leg pain," as well as midline pain at the thoracic spine and neck and right arm pain.  (*Id.* at 324.)  Dr. Rosenberg noted Borawski had been through "years of PT."  (*Id.*)  On examination, Dr. Rosenberg found Borawski had an antalgic gait, favoring his left leg, no upper or lower extremity weakness or numbness, and a positive straight leg raise test bilaterally, with the left worse than the right.  (*Id.*)  Dr. Rosenberg diagnosed Borawski with lumbar radiculopathy at L4/5 on the right as a result of a "probable herniated disc since he has a very strongly positive SLR test."  (*Id.*)  Dr. Rosenberg ordered two sessions of epidural steroid injections and a Medrol dose pack.  (*Id.*)  Dr. Rosenberg noted Borawski may need a cervical MRI.  (*Id.*)

A March 2, 2017 lumbar MRI revealed "[m]ultilevel spondylosis with moderate canal stenosis at L4-5" and "[m]oderate foraminal stenoses are present at L4-5 and L5-S1."  (*Id.* at 395-97.)

On March 3, 2017, Borawski saw Michael Bahntge, M.D., for a neurology consultation.  (*Id.* at 380.)  Borawski complained of low back pain when standing, sitting, or laying down, and left sciatica pain when "up and about."  (*Id.*)  Dr. Bahntge noted Borawski was "audibly hyperventilating" and was "constantly" shifting in his seat.  (*Id.*)  Borawski described his sciatica pain as a "'real bad cramp'" and numbness and tingling that was most severe in his feet but traveled up his legs into his buttocks.  (*Id.* at 381.)  The numbness and tingling were constant.  (*Id.*)  Borawski also complained of his left leg feeling weaker than his right but could not identify which actions were weak or weaker.  (*Id.*)  Borawski described his balance as "'so-so.'"  (*Id.*)  Borawski also reported right shoulder pain and a mild burning in his left shoulder that got worse with certain movements or laying on it.  (*Id.*)

On examination, Dr. Bahntge found painful right shoulder abduction, as well as painful right shoulder external rotation, although to a lesser extent.  (*Id.* at 382.)  Dr. Bahntge also found diminished pin sensation over both forearms, the posterior aspect of the left arm, and between the knees and mid-thighs

bilaterally, with sparing of the volar surfaces and some sparing of the right arch.  (*Id.*)  Vibration and JPS

were "moderately diminished" in both great toes, with the left worse than the right.  (*Id.*)  Dr. Bahntge

found normal muscle strength and movement, although he noted pain in the low back with flexion of the

right or left hip with both knees bent, normal finger and toe movement, and negative Romberg's sign.

(*Id.*)  Dr. Bahntge noted Borawski had an antalgic gait without his cane.  (*Id.*)  Dr. Bahntge opined as

follows:

> There is probably rotator cuff or something of that sort causing the patient's severe pain on right shoulder abduction and on right shoulder external rotation.  I defer to Dr. Rosenberg on its treatment.  The sensory loss to pin appears to be separate, but it is non-dermatomal.  There are no associated findings to suggest that this non-dermatomal upper extremity sensory loss is myelopathic.  There is no weakness or reflex change to afford diagnostic leverage with his neck and shoulder pains, apart from my speculation about something "musculoskeletal" going on with his right shoulder, as noted above.

> There are no motor or reflex changes to afford me diagnostic leverage as regards his low back and leg complaints.  The sensory changes are non-dermatomal.  There are no associated findings to suggest that this non-dermatomal lower extremity sensory loss is due to myelopathy.  The patient's pain adheres to left S1 territory, and he has pain which increases with prolonged standing or (not very) prolonged walking; in this, it resembles neurogenic intermittent claudication, the treatment for which is lumbar paraspinal strengthening exercises and weight loss to retard subluxation of one vertebra on another.  It is a dynamic process, not present all the time; as such, EMG is often not of much help as nerve injury must last at least 3 weeks to be dependently detected.  MRI is often not of much help as the patient's spine is aligned properly when lying supine.  I am sending him to PT for lumbosacral paraspinal strengthening exercises and have advised him to lose weight for his NIC.

> One can see neurogenic intermittent claudication with spinal dural AVM.  One needs a good MRI of the LS spine for that.  Dr. Kelly of neurosurgery felt the images were not adequate.  I will order it repeated with and without dye.  I will see him back when it is completed.  I will check a creatinine.

(*Id.*)

On March 16, 2017, Borawski saw Dr. McLoney for follow up.  (*Id.* at 377.)  Borawski reported

he was scheduled for injections the following week with Dr. Rosenberg.  (*Id.*)  Borawski also stated Dr.

Kelly had told him he had "stenosis and discs," but surgery was not an option as he might end up worse.

(*Id.*)  Borawski reported Dr. Kelly had ordered another MRI of his spine and it was scheduled for next week.  (*Id.*)  Borawski told Dr. McLoney that Dr. Bahntges thought the problem might be vascular and was hoping to rule out spinal dural AVM with the MRI.  (*Id.*)  Dr. Bahntges also recommended physical therapy, but Borawski told Dr. McLoney he wanted to wait until after the injections as he was "'not in any shape for PT.'"  (*Id.*)  Dr. Mcloney noted no abnormal findings on examination.  (*Id.* at 379.)

On March 22, 2017, Borawski saw William Selig, CNP, for a skin problem, anxious feeling, and insomnia.  (*Id.* at 373.)  On examination, Selig found normal skin color, texture, and turgor, with no rashes or legions, normal range of motion, and normal gait.  (*Id.* at 374.)  Selig diagnosed an adverse drug reaction and prescribed hydroxyzine.  (*Id.*)

On March 25, 2017, Dr. Bahntge called Borawski with the results of his recent MRI.  (*Id.* at 373.)  Dr. Bahntge told Borawski the MRI revealed arthritis that could cause local pain, as well as "'slight'" disc displacement of the left L5 nerve root.  (*Id.*)  All stenoses were "moderate at worst."  (*Id.*)  No cause of claudication, including the spinal dural AVM for which Dr. Bahntge was looking, was present.  (*Id.*)

On May 10, 2017, Borawski saw Dr. Rosenberg for follow up.  (*Id.* at 369.)  Borawski reported complete pain relief for two days after his epidural steroid injections.  (*Id.*)  Borawski complained of waking frequently as a result of back and left leg pain.  (*Id.*)  Borawski also told Dr. Rosenberg his left hand got very numb and weak, and he was dropping things with his left hand.  (*Id.*)  On examination, Dr. Rosenberg found poor balance and an antalgic gait, and noted Borawski walked with a cane.  (*Id.*)  However, Dr. Rosenberg also found no upper or lower extremity weakness or numbness, negative Hofman's sign, and negative straight leg raise test bilaterally.  (*Id.*)  Dr. Rosenberg listed the following under his impressions: intermittent cervical radicular pain and imbalance; lumbar radiculopathy at L4/5 on the right; small pedicles and severe foraminal stenosis – bony at L5/S1; lumbar herniated disc; lumbar spinal stenosis at L4/5 and L3/4; and neck and thoracic pain.  (*Id.*)  Dr. Rosenberg referred Borawski to

physical therapy for a consultation, ordered a cervical MRI, and started Borawski on a trial of Neurontin. (*Id.*)

On May 22, 2017, Borawski saw William Mallory, PT, for his first physical therapy visit for his back pain.  (*Id.* at 365.)  Borawski reported diffuse low back and cervical pain, as well as constant bilateral lower extremity tingling and left-hand numbness.  (*Id.* at 366.)  Borawski told Mallory he drove short distances independently, but had difficulty cooking, cleaning, vacuuming, doing laundry, lifting, carrying, and showering.  (*Id.*)  Borawski reported the pain got worse with standing for short periods of time, walking short distances, prolonged standing, getting up from a chair, bending, and going up and down stairs.  (*Id.*)  Range of motion testing revealed reduced trunk range of motion and moderate limitation of hip extension and rotation.  (*Id.*)  Muscle strength revealed muscle strength ranging from 4-5.  (*Id.* at 367.)  A straight leg raise test was positive bilaterally.  (*Id.*)  Mallory noted Borawski had an antalgic gait.  (*Id.*)  Mallory determined Borawski demonstrated "poor ambulation, transfer and bed mobility tolerance," and walked with a single point cane.  (*Id.* at 368.)  Mallory estimated Borawski's prognosis was fair.  (*Id.*)

On June 6, 2017, Borawski saw Mallory for his second physical therapy visit.  (*Id.* at 361.)  Borawski reported his pain remained unchanged, and he was doing his home exercise program twice a day.  (*Id.*)

On July 20, 2017, Borawski saw Dr. McLoney for follow up.  (*Id.* at 341.)  Borawski reported he had undergone two injections by Dr. Rosenberg.  (*Id.*)  The first injection at L1 helped a little, and the second injection worked for two days.  (*Id.*)  Dr. Rosenberg sent Borawski to physical therapy to get an MRI of his cervical spine.  (*Id.*)  Borawski reported having gone to six physical therapy appointments. (*Id.*)  Borawski told Dr. McLoney that Dr. Rosenberg believed his sciatica stemmed from something in his neck.  (*Id.*)  Borawski also complained of continued right shoulder pain and left knee pain.  (*Id.* at 342.)  Borawski told Dr. McLoney he had chronic fatigue that he thought stemmed from sleep deprivation as a

8

result of his restless leg syndrome, which also persisted.  (*Id.*)  On examination, Dr. McLoney found no edema, and with respect to Borawski's right shoulder, Dr. McLoney found it was stable, normal to palpation, with no effusion present, although range of motion was limited due to discomfort and there was some crepitus with range of motion.  (*Id.* at 343-44.)  Dr. McLoney continued Borawski's medications, added Lipitor for cholesterol and Provigil for daytime tiredness, and referred Borawksi to orthopedics for his knee and shoulder pain.  (*Id.* at 344.)  Dr. McLoney directed Borawski to follow up with Dr. Rosenberg regarding physical therapy and next steps and told Borawski he should exercise at least fifteen minutes every other day.  (*Id.*)

On August 15, 2017, Borawski saw Dr. Rosenberg for follow up.  (*Id.* at 335.)  Office staff noted Borawski was a fall risk because of his cane.  (*Id.*)  Borawski told Dr. Rosenberg he had not seen any benefit from physical therapy for his neck and thoracic pain, but he had benefited from Neurontin and had no side effects from his current dose.  (*Id.*)  Dr. Rosenberg increased Borawski's Neurontin and ordered a cervical MRI.  (*Id.* at 336.)

An after-visit summary dated October 19, 2017 from an appointment with Dr. McLoney reflected a cane had been ordered and a script for a disability placard had been given.  (*Id.* at 410.)

On October 24, 2017, Borawski saw Daniel Zalevsky, PA-C, for evaluation of his left knee pain that was associated with decreased ambulation and antalgic gait.  (*Id.* at 424.)  Borawski reported the pain had been present for eight years since he had a motorcycle accident; while the pain had been consistent, he had not sought treatment before because he was "'toughing it out.'"  (*Id.*)  Borawski described the pain as aching, sharp, stabbing, and throbbing.  (*Id.*)  He rated his pain as a 2-9/10.  (*Id.*)  Borawski did not experience pain at night or at rest.  (*Id.*)  Activity, standing, walking, and getting in and out of cars exacerbated the pain, and he had trouble going down stairs.  (*Id.*)  Borawski told Zalevsky he could walk one to two blocks with a cane.  (*Id.*)  Associated symptoms included intermittent back pain, intermittent

radiculopathy with neurological complaints minimal to none intermittently, and intermittent hip pain. (*Id.*) Zalevsky noted Borawski had undergone remote physical therapy for his knees but had not maintained his home exercise program. (*Id.*)

On examination, Zalevksy found an antalgic gait, minimal swelling at the ankles and feet bilaterally, knee stability bilaterally, tenderness at the maximal joint line and anterior knee, crepitus, and patellar apprehension on the left but none on the right, and unremarkable range of motion of the hips bilaterally. (*Id.* at 426-27.) X-rays taken that day revealed signs of "moderate patellofemoral degeneration," but no signs of fracture or dislocation. (*Id.* at 427.) Zalevsky recommended weight loss, referred Borawski to physical therapy, and directed Borawksi to wear a reaction knee brace as needed. (*Id.*) If pain prevented Borawski from performing his exercises effectively, Zalevsky noted he could return at any time for a cortisone injection. (*Id.*)

On November 22, 2017, Borawski saw Stephen Cheng, M.D., for an initial visit regarding his right shoulder pain. (*Id.* at 471.) Borawski reported he had experienced right shoulder pain since his motorcycle accident in 2009. (*Id.*) Borawski told Dr. Cheng his pain was worse with pouring coffee, reaching up, and elevation. (*Id.*) He used to get pain at night before his right shoulder injection by PA-C Zalevsky on October 31, 2017. (*Id.*) The injection helped his pain. (*Id.*) Borawski also reported left hand pain, some dorsal numbness, a little stiffness, and mild pain otherwise. (*Id.*) Dr. Cheng reviewed a January 2017 x-ray of Borawski's right shoulder, which showed subtle chronic changes, mild to moderate osteoarthritis, and poor outlet. (*Id.* at 473.) An x-ray of the left hand taken on November 22, 2017 revealed healed metacarpal shaft fractures of the ring and middle fingers and a little osteoarthritis. (*Id.*) On examination, Dr. Cheng found full strength and range of motion of the right shoulder, AC tenderness, and mild Hawkins sign. (*Id.*) Dr. Cheng also found a little diffuse tenderness and swelling of the left hand. (*Id.*) Dr. Cheng diagnosed Borawski with right AC joint osteoarthritis and right shoulder

10

sprain/impingement.  (*Id.*)  Dr. Cheng referred Borawski to physical therapy and prescribed Mobic.  (*Id.* at 474.)

On November 28, 2017, Borawski underwent a consultative psychological examination by Janis Woodworth, Ph.D.  (*Id.* at 445.)  Borawski told Dr. Woodworth he was disabled as a result of his chronic pain and chronic fatigue.  (*Id.*)  Borawski reported he spends all day trying to get some sleep because of his restless leg syndrome, or he sleeps 14 to 16 hours a day.  (*Id.* at 447.)  His appetite was fair.  (*Id.*)  Borawski reported a mental health history that included a hospitalization in 2001 in Lakewood and participation in intensive outpatient treatment in 2012.  (*Id.*)  Borawski told Dr. Woodworth he had experienced depression symptoms since he was seven or eight, but it had been worse since 1997.  (*Id.* at 447-48.)  Borawski complained of sadness, irritability, low energy and motivation, hopelessness, and not caring if he lived or died.  (*Id.* at 448.)  Borawski denied suicidal ideation, intent, or plan, anxiety, PTSD symptoms, panic disorder, hallucinations, delusions, or paranoid delusions, homicidal ideation, intent, or plan, and experiencing cognitive problems.  (*Id.*)  Dr. Woodworth noted: "The claimant indicated that most of his activities of daily living are not impacted by psychological or medical symptoms, and he is able to take care of most activities of daily living without assistance.  The claimant is able to dress, bathe, do laundry, shop, and manage money independently.  He has difficulty cleaning, and no one really cleans the house he lives in."  (*Id.*)  Borawski said he had no hobbies and he did not socialize.  (*Id.*)

On examination, Dr. Woodworth found Borawski cooperative, but his manner of relating was inconsistent.  (*Id.*)  Dr. Woodworth determined Borawski's hygiene and grooming were normal, but he made inappropriate eye contact (too intense or not enough).  (*Id.*)  His posture was tense, and his motor activity was restless.  (*Id.*)  Dr. Woodworth found Borawski's speech, language skills, thought processes, and thought content unremarkable.  (*Id.* at 448-49.)  Borawski demonstrated a dysthymic mood and blunted affect.  (*Id.* at 449.)  Dr. Woodworth found Borawski's intelligence in the average range, and his

11

fund of information was appropriate to his experience.  (*Id.*)  Borawski demonstrated poor insight and judgment.  (*Id.*)

Dr. Woodworth determined Borawski met the criteria for a diagnosis of persistent depressive disorder.  (*Id.* at 44--50.)  Dr. Woodworth noted Borawski's "[c]urrent symptoms that are interfering with life and work include irritability, angry outbursts when challenged, and difficulty getting along with others."  (*Id.* at 451.)  Dr. Woodworth determined Borawski's attention, concentration, recent and remote memory skills, and working memory for simple and complex tasks were all in the average range.  (*Id.*)  Dr. Woodworth opined Borawski "should have no more difficulty than same-age peers" in understanding, remembering, and carrying out instructions, maintaining attention and concentration, and maintaining persistence and pace.  (*Id.* at 451-52.)  Dr. Woodworth further opined Borawski would have "more difficulty that other same-age peers" in responding appropriately to supervisors and coworkers.  (*Id.* at 452.)  Finally, Dr. Woodworth stated Borawski "report[ed] symptoms of depression which may interfere with his ability to respond appropriately to work pressures in a work setting."  (*Id.*)

On December 5, 2017, Borawski saw PA-C Zalevsky for follow up regarding his left patellofemoral arthritis.  (*Id.* at 480.)  Borawski told Zalevsky he had not gone to physical therapy for his knee or his right shoulder because of a "lack of motivation" he attributed to a recent change in his medications and the combination of gabapentin and Lyrica.  (*Id.*)  Borawski also had not lost weight.  (*Id.*)  Borawski reported mild pain relief with turmeric and Mobic, but the reaction knee brace had not helped his knee pain.  (*Id.*)  Borawski told Zalevsky the pain was worse, and he wanted the cortisone injection offered at his last visit.  (*Id.*)  On examination, Zalevsky found an antalgic gait, minimal swelling at the ankles and feet bilaterally, knees stable to testing bilaterally, tenderness at the maximal joint line and anterior knee, crepitus, and patellar apprehension on the left, but none on the right, and unremarkable

range of motion of the hips bilaterally.  (*Id.* at 480-81.)  Range of motion of the legs was decreased, slightly more on the left than the right.  (*Id.*)  Zalevsky directed Borawski to resume weight loss.  (*Id.*)

On December 12, 2017, Borawski saw Dr. Rosenberg for follow up.  (*Id.* at 487.)  Office staff noted Borawski was a fall risk because of his cane.  (*Id.*)  Borawski reported "at least 80%" improvement in his back pain.  (*Id.*)  Borawski told Dr. Rosenberg he stopped taking Cymbalta on his own and his pain got worse.  (*Id.*)  Borawski also reported sleeping 14-15 hours a day.  (*Id.*)  Dr. Rosenberg decreased Borawski's Neurontin and told him to consider using less Cymbalta.  (*Id.* at 488.)  Dr. Rosenberg told Borawski to take Mobic as needed.  (*Id.*)  Dr. Rosenberg also noted, "Conside[r] psychiatry consult and follow for his sleep and mood."  (*Id.*)

On February 3, 2018, Borawski underwent a physical consultative examination with Freeland Ackley, M.D.  (*Id.* at 455.)  Borawski reported he was unable to work as a result of low back pain that had been going for years, as well as left side sciatica.  (*Id.*)  Borawski further reported he could sit for two hours, stand for five minutes, walk 1/16 of a mile, and lift five pounds.  (*Id.* at 456.)  Borawski described a typical day as watching TV, sleeping, and trying to read.  (*Id.*)  Dr. Ackley noted Borawski's eye contact, speech, and mood were appropriate, and his memory and concentration were normal.  (*Id.* at 457.)  Dr. Ackley determined Borawski's hand-eye coordination was good, and he appeared to have no balance problems.  (*Id.*)  While Borawski arrived with a cane and had an "[a]ntalgic, reciprocal gait pattern" without the cane, Dr. Ackley noted Borawski was able to complete the exam without his cane.  (*Id.* at 458.)  Dr. Ackley found sensation intact to light touch, and a straight leg raise test was negative bilaterally.  (*Id.*)  Dr. Ackley further found Borawski could: lift, carry, and handle light objects; rise from a sitting position without assistance; get up and down from the examination table with mild difficulty; walk on heels and toes and tandem walk; and dress and undress adequately.  (*Id.*)  Dr. Ackley noted Borawski's "pain was a limiting factor during the exam but seemed not to correlate with his exam as he had 5/5

13

strength in the b/l LE with full ROM and a neg SLR test.  Sciatica pain was recreated with IR/ER of the

hip." (*Id.*)

> Dr. Ackley stated:

>> He has no spinal tenderness and no evidence of muscular asymmetry nor atrophy and no acute joint findings.  Strength and range of motion are within normal limits bilaterally.  He is able to sit, stand, and walk.  He was able to rise from the exam table multiple times without assistance.  Speech, hearing, vision, sensation and reflexes are grossly intact.  Fine motor coordination and handling is normal.  He answered questions appropriately and within reason.

>> With regards to the pts gait, need for cane/walker or lifting restrictions – his exam was somewhat limited due to his pain with regards to ambulation.  He is not ataxic and has no weakness.  He had a negative SLR test on the left and said the sciatic pain got worse with IR/ER of the hip.  No lifting restrictions.  Unable to evaluate time he is able to walk or stand due to his pain however he had no weakness or limitations on exam.  His limiting factor with the exam today is his pain that is not controlled along with chronic deconditioning, morbid obesity, and uncontrolled HTN.

(*Id.* at 459.)

On May 8, 2018, Borawski saw Dr. Rosenberg for follow up.  (*Id.* at 492.)  Office staff noted

Borawski was a fall risk because of his cane.  (*Id.*)  Borawski complained of back and left leg pain but

denied weakness and numbness.  (*Id.*)  Borawski reported sitting relieved the pain, while standing and

walking "dramatically increase[d]" the pain.  (*Id.*)  Borawski told Dr. Rosenberg he had run out of both

Neurontin and Mobic.  (*Id.*)  Dr. Rosenberg planned to administer an L5/S1 epidural steroid injection and

noted Borawski could not do physical therapy now because of "too much pain."  (*Id.* at 493.)  Dr.

Rosenberg directed Borawski to restart Neurontin and Mobic.  (*Id.*)  Dr. Rosenberg noted a psychiatric

consult should be considered and Borawski should be followed for his sleep and mood.  (*Id.*)

On May 30, 2018, Borawski saw Dr. McLoney for follow up.  (*Id.* at 500.)  Borawski told Dr.

McLoney he had an injection scheduled with Dr. Rosenberg the following Monday.  (*Id.*)  Borawski also

reported feeling a "popping" sensation in his low back and now he had sciatica pain down both legs.  (*Id.*)

14

Borawski told Dr. McLoney he had seen Dr. Rosenberg for this, and Dr. Rosenberg restarted him on Neurontin.  (*Id.*)  Borawski also related receiving injections in his knee and shoulder and taking Mobic for the pain.  (*Id.*)  Since Borawski thought the Mobic was helpful, Dr. Rosenberg refilled the prescription. (*Id.*)  Dr. McLoney noted Borawski was on Cymbalta for depression, and that Borawski was unsure if this helped with his mood or not.  (*Id.* at 501.)  Dr. McLoney found nothing abnormal on examination, although he described Borawski as walking with a cane.  (*Id.* at 503-04.)  While Dr. McLoney found Borawski exhibited normal mood, affect, and behavior, he diagnosed Borawski with depression and referred him to psychology and psychiatry.  (*Id.* at 504.)  Dr. McLoney also referred Borawski for a sleep study.  (*Id.*)  Dr. McLoney directed Borawski to continue his medications and follow up with his specialists as scheduled, as well as exercise 15-30 minutes every other day.  (*Id.*)

On July 11, 2018, Borawski saw Dr. Rosenberg for follow up.  (*Id.* at 559.)  Office staff noted Borawski was not a fall risk.  (*Id.*)  Borawski reported his last epidural at L5/S1 "was helpful by 40%." (*Id.*)  Dr. Rosenberg noted Borawski was on 600 mg BID of Gabapentin, and with any higher of a dose Borawski got sleepy, so Dr. Rosenberg could not increase his dose.  (*Id.*)  Dr. Rosenberg prescribed Topamax and increased Borawski's Cymbalta dosage.  (*Id.*)

On August 9, 2018, Borawski saw Shira Fass, Ph.D., for his first mental health counseling and therapy session.  (*Id.* at 589.)  On examination, Dr. Fass found Borawski adequately groomed, cooperative, and oriented times three.  (*Id.*)  Borawski demonstrated spontaneous speech with a normal rate and flow, a logical, organized thought process, good judgment and insight, normal recent and remote memory, sustained concentration, tight association, appropriate language, and "okay" fund of knowledge. (*Id.* at 589-90.)  Dr. Fass found Borawski presented with a depressed mood and full range of affect.  (*Id.* at 590.)  Dr. Fass diagnosed Borawski with recurrent depression.  (*Id.* at 591.)

On August 24, 2018, Borawski saw Shannon Cusack, LISW-S, for a mental health assessment. (*Id.* at 594.)  Borawski told Cusak he was there because his primary physician wanted him to see someone in behavioral health and had ordered three visits of psychology and psychiatry.  (*Id.*)  Cusack noted Borawski had already had one appointment with Dr. Fass.  (*Id.*)  Cusak noted Borawski walked with a cane and that he complained of bad sciatica in both legs that interfered with his sleep, as well as restless leg syndrome.  (*Id.*)  Borawski reported his depression symptoms started around 2016.  (*Id.*)  Borawski described feeling like he was "in an inescapable black hole" and not who he used to be.  (*Id.*)  He told Cusack his sciatica and sleep issues had gotten so bad he could not work, and he could no longer do the hobbies he used to enjoy.  (*Id.*)  Borawski also complained of past difficulties with ruminating thoughts. (*Id.*)  Borawski endorsed depressed mood, poor appetite/overeating, insomnia/hypersomnia, low energy/fatigue, poor self-esteem, poor concentration, and feelings of hopelessness.  (*Id.* at 594-95.)

On examination, Cusack found Borawski adequately groomed, sleepy/tired, and overweight.  (*Id.* at 598.)  Cusack noted Borawski walked with a cane.  (*Id.*)  Cusack was unable to assess Borawski's orientation.  (*Id.*)  Cusack determined Borawski demonstrated distractible concentration, cooperative behavior, euthymic mood, congruent affect, slurred and slow speech, loose association, and fair insight and judgment.  (*Id.*)  Cusack diagnosed Borawski with persistent depressive disorder.  (*Id.*)

On August 27, 2018, Borawski saw Dr. McLoney for follow up.  (*Id.* at 603.)  Dr. McLoney reviewed Dr. Rosenberg's July 11, 2018 note, which included prescribing Topamax, increasing Cymbalta, and continuing Neurontin.  (*Id.* at 603-04.)  Borawski thought the last injection hit his sciatica nerve.  (*Id.* at 604.)  Borawski told Dr. McLoney he could not walk far and was "[l]ooking at getting a motorized wheelchair."  (*Id.*)  Borawski said he did not feel he needed the wheelchair at home because there were places to sit down; rather, he wanted one because he could not go to a park or a concert, and his inability to get around was impacting his quality of life.  (*Id.*)  On examination, Dr. McLoney found Borawski was

16

ambulating with difficulty using a cane. (*Id.* at 607.) Dr. McLoney noted he would order a motorized wheelchair. (*Id.* at 608.)

On October 15, 2018, Borawski saw Leshara Colvin, APRN-CNP, for medication management. (*Id.* at 612.) Borawski complained of worsening depression since 2016 and it was exacerbated by his pain and not being who he used to be. (*Id.*) Borawski told Colvin all he did was suffer and the only reason for his existence was caring for his father. (*Id.*) Borawski denied doing anything for fun and said he never left the house. (*Id.*) Colvin noted Borawski was walking with a cane. (*Id.* at 617.) On examination, Colvin found Borawski adequately groomed with good hygiene and he was oriented times three. (*Id.*) Borawski demonstrated cooperative behavior, loud, spontaneous speech with normal rate and flow, a logical, organized thought process, depressed mood, full range of affect, impaired attention/concentration, poor recent memory, and fair judgment and insight. (*Id.*) Colvin diagnosed Borawski with moderate major depressive disorder and added Wellbutrin to his medication regimen. (*Id.*)

On November 6, 2018, Borawski saw Dr. Fass for follow up. (*Id.* at 624.) Borawski complained of being in a lot of physical pain, and said he was willing to try a pain group. (*Id.*) Borawski told Dr. Fass most days he was inactive and stayed at home. (*Id.*) Borawski described his pain as an obstacle to doing things outside his house. (*Id.*) Borawski said it felt good to talk to someone. (*Id.*) On examination, Dr. Fass found Borawski adequately groomed, cooperative, and oriented times three. (*Id.*) Borawski demonstrated spontaneous speech with a normal rate and flow, a logical, organized thought process, good judgment and insight, normal recent and remote memory, sustained attention span and concentration, tight association, appropriate language, and "okay" fund of knowledge. (*Id.* at 624-25.) Dr. Fass found Borawski presented with a depressed mood and full range of affect. (*Id.* at 625.)

17

## C.      State Agency Reports

### 1.      Physical Impairments

On March 7, 2017, Leon Hughes, M.D., evaluated Borawski's physical impairments and limitations.  (Tr. 88-90.)  Based upon his review of Borawski's records, Dr. Hughes opined Borawski could occasionally lift/carry 20 pounds, frequently lift/carry 10 pounds, stand/walk for about six hours in an eight-hour workday, and sit for about six hours in an eight-hour workday.  (*Id.* at 88.)  Borawski's ability to push/pull was unlimited, other than shown for lift/carry.  (*Id.*)  Dr. Hughes further opined Borawski could occasionally climb ramps/stairs, but could never climb ladders, ropes, or scaffolds.  (*Id.*)  Borawski could occasionally stoop, kneel, crouch, and crawl, and could frequently balance.  (*Id.* at 88-89.)  Dr. Hughes further opined Borawski's ability to reach in front and/or laterally was limited on the right, but his abilities to handle, finger, and feel were unlimited.  (*Id.* at 89.)  Borawski must avoid concentrated exposure to fumes, odors, dust, gases, poor ventilation, etc., and must avoid even moderate exposure to hazards (machinery, heights, etc.).  (*Id.* at 90.)

On February 7, 2018, on reconsideration, Leslie Green, M.D., opined Borawski could occasionally lift/carry 20 pounds, frequently lift/carry 10 pounds, stand/walk for four hours in an eight-hour workday, and sit for about six hours in an eight-hour workday.  (*Id.* at 108.)  Borawski's ability to push/pull was as limited in the right upper extremity and the left lower extremity.  (*Id.*)  Dr. Green further opined Borawski could occasionally climb ramps/stairs, but could never climb ladders, ropes, or scaffolds.  (*Id.*)  Borawski could occasionally balance, stoop, kneel, crouch, and crawl.  (*Id.* at 108-09.)  Dr. Green further opined Borawski's ability to reach overhead, in front, and/or laterally was limited on the right, but his abilities to handle, finger, and feel were unlimited.  (*Id.* at 109.)  Borawski must avoid concentrated exposure to fumes, odors, dust, gases, poor ventilation, etc., and must avoid even moderate exposure to hazards (machinery, heights, etc.).  (*Id.* at 110.)

## 2. Mental Impairments

On November 30, 2017, Janet Souder, Psy.D., evaluated Borawski's mental impairments and limitations. (*Id.* at 105-06, 111-12.) Dr. Souder concluded that Borawski had severe medically determinable mental impairments that would result in no limitations in his ability to understand, remember, or apply information or concentrate, persist, or maintain pace, but would cause moderate limitations in his abilities to interact with others and adapt or manage himself. (*Id.* at 105.) Dr. Souder opined Borawski was capable of infrequent, superficial interactions with coworkers, supervisors, and the public. (*Id.* at 111.) Dr. Souder further opined Borawski was capable of adapting to infrequent changes in a work setting. (*Id.* at 112.)

## D. Hearing Testimony

During the February 4, 2019 hearing, Borawski testified to the following:

- He had a high school diploma and an Associate degree in medical laboratory tech work. (Tr. 40.) He worked at the Cleveland Clinic until 2013, when he was terminated for insubordination. (*Id.*) He then worked as a truck driver. (*Id.* at 45.) He stopped working as a truck driver because of his back pain and sciatica, and his sleep problems made him "too dangerous." (*Id.* at 47.)

- He has had back pain and left leg sciatica since he was a child. (*Id.* at 51.) A truck accident in 1997 "really did a number on [him]." (*Id.*) He has pain every day in his lower back, sciatica in both legs, and numbness and tingling in both legs that starts in his feet and moves upward. (*Id.*) He takes several medications for the pain and uses lidocaine patches and a lidocaine roller. (*Id.*) He lays down or stays off his feet as much as he can because if he stands anywhere between three to five minutes his low back gets tight and painful and causes his sciatica to flare. (*Id.*) The only thing that alleviates the pain is sitting down. (*Id.*) Sitting for a long time also makes the pain worse. (*Id.* at 52.) He could sit in a wooden kitchen chair for 15 minutes, and an office chair for 15-20 minutes, before needing to stand up. (*Id.*) He could sit in his comfortable overstuffed rocker at home for an hour easily before needing to stand up. (*Id.*) He would need to stand for three to five minutes before sitting down again. (*Id.* at 52-53.)

- He was using a cane at the hearing. (*Id.* at 53.) He uses the cane because of his left knee, and after his last injection he began getting sciatica pain in his right leg. (*Id.*) The cane keeps him from falling over on his face. (*Id.*). He began using the cane last fall. (*Id.*) His doctor ordered a disability placard for his vehicle the same day his cane was prescribed. (*Id.*) He was having trouble walking, and the placard gets him

19

closer to the store and a cart. (*Id.* at 54.) He leans on the cart and it eases his low back and sciatica pain. (*Id.*) His doctor also ordered a motorized wheelchair, but it was never fulfilled because insurance would not cover it since he only needed it outside his home. (*Id.* at 55.) He did not have the money to pay for it himself. (*Id.* at 56.)

- He sleeps often with no set sleep schedule. (*Id.*) His medication makes him tired and his restless leg syndrome dictates when he sleeps. (*Id.* at 57.) His restless leg syndrome wakes him up at least two to three times every time he sleeps. (*Id.*) His CPAP/BIPAP helps his sleep apnea. (*Id.* at 57-58.) However, the hose and mask interfere with his sleep. (*Id.*)

The VE testified Borawski had past work as a medical laboratory technician and tractor trailer driver. (*Id.* at 66.) The ALJ then posed the following hypothetical question:

> All right, hypothetical #1, assume an individual who can engage in light exertion, who should never climb any ladders, ropes or scaffolds, who can frequently balance, occasionally climb ramps and stairs, occasionally stoop, kneel, crouch and crawl. This person is limited to reaching overhead with the right extremity frequently.
>
> * * *
>
> Okay, I'll try to speak a little louder, I don't know if that helps to speak a little closer to the microphone. Reaching overhead with the right extremity is limited to frequently and avoid working in unprotected heights. I will also add and avoid using dangerous machinery such as power saws and jackhammers. As you review this hypothetical individual can you tell me whether this person could return to any of the claimant's past work?

(*Id.* at 66-67.)

The VE testified the hypothetical individual would be able to perform Borawski's past work as a medical laboratory technician, and the hypothetical individual could also perform Borawski's past work as a tractor trailer driver as Borawski performed it, but not as typically performed. (*Id.* at 67.)

The ALJ then posed a second hypothetical:

> Hypothetical #2, this individual is limited to light exertion, limited to standing and walking four hours maximum, limited to frequent push, pull with the right upper extremity, limited to frequent foot controls with the lower left extremity. Never climb ladders, ropes or scaffolds, all other postural activities can be performed up to occasionally. Frequent reaching overhead with the right upper extremity, avoid concentrated exposure --

20

\* \* \*

> Yeah, avoid concentrated exposure to extreme temperatures, humidity, vibration and operating dangerous moving equipment such as power saws and jackhammers and no work in unprotected heights. As you review this hypothetical person could this person return to the, any of the claimant's past work?

(*Id.* at 67-68.)

The VE testified the hypothetical individual would be able to perform Borawski's past work as a medical laboratory technician, but not as a tractor trailer driver.  (*Id.* at 68.)

The ALJ then added the following limitation to both hypotheticals: "[T]he person would need the sue [sic] of a cane when ambulating distances greater than 100 feet and on uneven surfaces outdoors, as you review this hypothetical individual can you tell me whether or not this would impact your answers to either hypothetical #1 or hypothetical #2?"  (*Id.* at 68-69.)

The VE testified the hypothetical individual could still perform the medical laboratory technician job but could not perform the tractor trailer driver job.  (*Id.* at 69.)

### III.    STANDARD FOR DISABILITY

In order to establish entitlement to DIB under the Act, a claimant must be insured at the time of disability and must prove an inability to engage "in substantial gainful activity by reason of any medically determinable physical or mental impairment," or combination of impairments, that can be expected to "result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.130, 404.315 and 404.1505(a).

A claimant is entitled to a POD only if: (1) he had a disability; (2) he was insured when he became disabled; and (3) he filed while he was disabled or within twelve months of the date the disability ended. 42 U.S.C. § 416(i)(2)(E); 20 C.F.R. § 404.320.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process.  20 C.F.R. § 404.1520(a)(4).  *See also Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).  First, the claimant must demonstrate that he is not currently engaged in "substantial gainful activity" at the time of the disability application.  20 C.F.R. § 404.1520(b).  Second, the claimant must show that he suffers from a "severe impairment" in order to warrant a finding of disability.  20 C.F.R. § 404.1520(c).  A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities."  *Abbot*, 905 F.2d at 923.  Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of age, education, or work experience.  *See* 20 C.F.R. § 404.1520(d).  Fourth, if the claimant's impairment or combination of impairments does not prevent him from doing his past relevant work, the claimant is not disabled.  20 C.F.R. § 404.1520(e)-(f).  For the fifth and final step, even if the claimant's impairment does prevent him from doing his past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled.  20 C.F.R. §§ 404.1520(g), 404.1560(c).

Here, Borawski was insured on his alleged disability onset date, June 9, 2016, and remained insured through March 31, 2020, his date last insured ("DLI.")  (Tr. 12, 16.)  Therefore, in order to be entitled to POD and DIB, Borawski must establish a continuous twelve-month period of disability commencing between these dates.  Any discontinuity in the twelve-month period precludes an entitlement to benefits. *See Mullis v. Bowen*, 861 F.2d 991, 994 (6th Cir. 1988); *Henry v. Gardner*, 381 F.2d 191, 195 (6th Cir. 1967).

## IV.    SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1.  The claimant meets the insured status requirements of the Social Security Act through March 31, 2020.

2.  The claimant has not engaged in substantial gainful activity since June 9, 2016, the alleged onset date (20 CFR 404.1571 *et seq.*).

3.  The claimant has the following severe impairments: lumbar degenerative disc disease; cervical degenerative disc disease; dysfunction of a major joint; and obesity (20 CFR 404.1520(c)).

4.  The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5.  After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except never climb ladders, ropes or scaffolds; occasionally climb ramps and stairs; frequently balance; occasionally stoop, kneel, crouch and crawl; limited to frequently reaching overhead with the right extremity; avoid working around unprotected heights and avoid using dangerous machinery, such as power saws and jack hammers.

6.  The claimant is capable of performing past relevant work as a *Medical Laboratory Technician* as generally and actually perform and as a *Truck Driver* as actually performed.  This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565).

7.  The claimant has not been under a disability, as defined in the Social Security Act, from June 9, 2016, through the date of this decision (20 CFR 404.1520(f)).

(Tr. 18-31.)

## V.    STANDARD OF REVIEW

The Social Security Act authorizes narrow judicial review of the final decision of the Social Security Administration (SSA)."  *Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 414 (6th Cir. 2011). Specifically, this Court's review is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards.  *See Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir.

2009).  Substantial evidence has been defined as "'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).  In determining whether an ALJ's findings are supported by substantial evidence, the Court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence.  *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

Review of the Commissioner's decision must be based on the record as a whole.  *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).  The findings of the Commissioner are not subject to reversal, however, merely because there exists in the record substantial evidence to support a different conclusion.  *Buxton v. Halter*, 246 F.3d 762, 772-73 (6th Cir.2001) (citing *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999) ("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached.").  This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference.  *Mullen*, 800 F.2d at 545 (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether proper legal standards were applied. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal.  *See, e.g., White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir.1996); *accord Shrader v. Astrue*, 2012 WL 5383120 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliam v. Astrue*, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, 2010 WL 2929562 (N.D. Ohio July 9, 2010).

## VI.    ANALYSIS

Borawski argues: "In this case, the ALJ's RFC finding omits significant limitations demonstrated by the evidence: Plaintiff's need for a cane, as prescribed by his treating physician, and limitations resulting from his mental impairments, as described by the Agency's own experts.  The result is an RFC that is contrary to law."  (Doc. No. 16 at 10.)  Borawski further argues that the ALJ's errors were not harmless.  (*Id.*)

The Commissioner responds that the ALJ properly excluded the need for an assistive device, as well as mental limitations, from the RFC.  (Doc. No 19 at 11, 16.)

The Court addresses each of these arguments in turn.

## A.    Need for a Cane

Borawski argues the ALJ acknowledged his use of a cane and the fact that a cane was prescribed, but then "*questioned the basis for the prescription*" in determining not to incorporate a cane into the RFC. (Doc. No 16 at 13) (emphasis in original).  Borawski accuses the ALJ of "playing doctor" and interpreting "raw medical data" in advancing "several theories as to why Plaintiff's cane, despite his physician's prescription for it, was not medically necessary . . . ."  (*Id.*)  Borawski asserts that even if the ALJ had

questions concerning the medical support for the cane prescription or the way Dr. McLoney conducted his examinations and structured his treatment records, the ALJ "had numerous options at her disposal, *none of which are to blatantly second-guess medical opinions referencing only her own*." (*Id.* at 14) (emphasis in original). Borawski argues the ALJ could have contacted Dr. McLoney for clarification, re-contacted the consultative examiner for clarification, called a medical expert, or sent the entire, updated case record to the Agency for evaluation by a medical consultant. (*Id.* at 14-15.)

The Commissioner argues Borawski failed to meet his burden to produce evidence that a cane was medically necessary and required inclusion in the RFC. (Doc. No. 19 at 11.) In addition, Borawski failed to identify relevant evidence necessitating a different RFC. (*Id.*) The Commissioner asserts the ALJ properly determined that Borawski's cane prescription "did not justify including a cane restriction in the RFC under relevant legal authority." (*Id.* at 12) (citation omitted). The ALJ was not required to recontact Borawski's physicians in this case, and Borawski cannot shift his burden to produce medical evidence demonstrating the need for a cane onto the ALJ. (*Id.* at 13-14.) Finally, even if the ALJ erred by excluding the need for a cane from the RFC, any error was harmless as the VFC testified Borawski could still perform past relevant work as a medical laboratory technician even with a restriction that a cane be used to walk distances greater than 100 feet and to walk on uneven surfaces outdoors. (*Id.* at 15.)

The RFC determination sets out an individual's work-related abilities despite his or her limitations. *See* 20 C.F.R. § 404.1545(a)(1). A claimant's RFC is not a medical opinion, but an administrative determination reserved to the Commissioner. *See* 20 C.F.R. § 404.1527(d)(2). An ALJ "will not give any special significance to the source of an opinion on issues reserved to the Commissioner." *See* 20 C.F.R. § 404.1527(d)(3). As such, the ALJ bears the responsibility for assessing a claimant's RFC based on all the relevant evidence (20 C.F.R. § 404.1546(c)), and must consider all of a claimant's medically determinable

impairments, both individually and in combination. *See* SSR 96–8p, 1996 WL 374184 (SSA July 2, 1996).

"In rendering his RFC decision, the ALJ must give some indication of the evidence upon which he is relying, and he may not ignore evidence that does not support his decision, especially when that evidence, if accepted, would change his analysis." *Fleischer*, 774 F. Supp. 2d at 880 (citing *Bryan v. Comm'r of Soc. Sec.*, 383 F. App'x 140, 148 (3d Cir. 2010) ("The ALJ has an obligation to 'consider all evidence before him' when he 'mak[es] a residual functional capacity determination,' and must also 'mention or refute [...] contradictory, objective medical evidence' presented to him.")). *See also* SSR 96-8p at *7, 1996 WL 374184 (SSA July 2, 1996) ("The RFC assessment must always consider and address medical source opinions. If the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted.")). While the RFC is for the ALJ to determine, the claimant bears the burden of establishing the impairments that determine her RFC. *See Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 391 (6th Cir. 1999).

It is well-established there is no requirement that the ALJ discuss each piece of evidence or limitation considered. *See, e.g., Conner v. Comm'r*, 658 F. App'x 248, 254 (6th Cir. 2016) (citing *Thacker v. Comm'r*, 99 F. App'x 661, 665 (6th Cir. May 21, 2004) (finding an ALJ need not discuss every piece of evidence in the record); *Arthur v. Colvin*, No. 3:16CV765, 2017 WL 784563, at *14 (N.D. Ohio Feb. 28, 2017) (*accord*). However, courts have not hesitated to remand where an ALJ selectively includes only those portions of the medical evidence that places a claimant in a capable light and fails to acknowledge evidence that potentially supports a finding of disability. *See e.g., Gentry v. Comm'r of Soc. Sec.*, 741 F.3d 708, 724 (6th Cir. 2014) (reversing where the ALJ "cherry-picked select portions of the record" rather than doing a proper analysis); *Germany–Johnson v. Comm'r of Soc. Sec.*, 313 F. App'x 771, 777 (6th Cir. 2008) (finding error where the ALJ was "selective in parsing the various medical

reports").  *See also Ackles v. Colvin*, No. 3:14cv00249, 2015 WL 1757474, at *6 (S.D. Ohio April 17, 2015) ("The ALJ did not mention this objective evidence and erred by selectively including only the portions of the medical evidence that placed Plaintiff in a capable light."); *Smith v. Comm'r of Soc. Sec.*, No. 1:11-CV-2313, 2013 WL 943874, at *6 (N.D. Ohio March 11, 2013) ("It is generally recognized that an ALJ 'may not cherry-pick facts to support a finding of non-disability while ignoring evidence that points to a disability finding.'"); *Johnson v. Comm'r of Soc. Sec.*, No. 2:16-cv-172, 2016 WL 7208783, at *4 (S.D. Ohio Dec. 13, 2016) ("This Court has not hesitated to remand cases where the ALJ engaged in a very selective review of the record and significantly mischaracterized the treatment notes.").

SSR 96–9p addresses the use of an assistive device in determining RFC and the vocational implications of such devices:

> **Medically required hand-held assistive device:** To find that a hand-held assistive device is medically required, there must be medical documentation establishing the need for a hand-held assistive device to aid in walking and standing, and describing the circumstances for which it is needed (i.e., whether all the time, periodically, or only in certain situations; distance and terrain; and any other relevant information). The adjudicator must always consider the particular facts of a case. For example, if a medically required hand-held assistive device is needed only for prolonged ambulation, walking on uneven terrain, or ascending or descending slopes, the unskilled sedentary occupational base will not ordinarily be significantly eroded.

SSR 96–9p, 1996 WL 374185, at *7 (S.S.A. July 2, 1996).  Interpreting this ruling, the Sixth Circuit has explained that where a cane "was not a necessary device for claimant's use, it cannot be considered an exertional limitation that reduced her ability to work."  *Carreon v. Massanari*, 51 F. App'x 571, 575 (6th Cir. 2002).  While the Sixth Circuit has not directly ruled on this issue, other courts in this district have noted that, in cases involving assistive devices including a cane, documentation "describing the circumstances for which [the assistive device] is needed" is critical to establishing that it qualifies as a "necessary device" under SSR 96-9p.  *McGill v. Comm'r of Soc. Sec. Admin.*, No. 5:18 CV 1636, 2019 WL 4346275, at *10 (N.D. Ohio Sept. 12, 2019), *citing Carreon v. Massanari*, 51 F. App'x at 575; *Tripp*

28

*v. Astrue*, 489 F. App'x 951, 955 (7th Cir. 2012) (noting that a finding of medical necessity of an assistive device requires a statement of the circumstances in which it is needed and that other circuits "have required an unambiguous opinion from a physician stating the circumstances in which an assistive device is medically necessary"); *Spaulding v. Astrue*, 379 F. App'x 776, 780 (10th Cir. 2010) (prescription for a cane from the Veteran's Administration insufficient to show medical necessity); *Howze v. Barnhart*, 53 F. App'x 218, 222 (3d Cir. 2002) (prescription and references that claimant used a cane insufficient to show medical necessity).

The ALJ found as follows with respect to Borawski's need for a cane:

> Finally, while the claimant's representative argued that he needs a cane to ambulate, physical examination findings and diagnostic data as discussed above and within do not support the conclusion that he medically needs a cane. It appears that the prescription of a cane and handicap placard are based on the claimant's subjective statements. Rather, the record shows that the physician prescribing the cane, placard and wheelchair did not conduct an appropriate clinical examination of the musculoskeletal system on many occasions over at least a one year period. Other examinations conducted by Dr. McLoney, Dr. Kelly, Dr. Bahntge, Dr. Chang and other physicians detail normal strength in all extremities; negative bilateral straight leg raising, ambulation both with and without a cane, albeit described as slow or antalgic, and non-dermatomal changes in sensation in his lower extremities (6F; 7F: 13F).

> Dr. McLoney's prescription of a cane and placard on October 19, 2017 are not sufficient to overcome the lack of medical documentation confirming his examination findings and documentation of the medical necessity for use of a cane on this date. (Ex. 8F/4) This exhibit is only the after visit summary confirming the orders—this is not the actual medical record documenting the examination that prompted the issuance of an order for a cane. This is not sufficient to overcome clinical findings in other parts of the record near the point in time when the prescription was issued which indicate greater functional abilities and lack of medical necessity for a cane. Moreover, Dr. McLoney does not document conducting an appropriate clinical examination of the musculoskeletal system. See for example on May 30, 2018, at Ex. BF/37-38 where he only documents the lack of edema and the claimant ambulating with a cane. He does not assess motor strength, sensation, range of motion, coordination, etc. in either upper or lower extremities.  See other examples February 2017 Ex. 6F/7—bilateral negative SLR sensation intact to touch; August 2017 Ex.  7F/8;  examination  by Daniel  Zelesky PA on December 5, 2017 at Ex. 13F, pgs. 14-16 –a limited exam of the lower extremities  and hips, however,  it confirmed  the claimant had normal sensation in both legs,  no

29

> neurological tenderness or tingling as he had been reporting to other. Distal pulses were presents [sic] and hips were normal as well.

(Tr. 15-16.)

> Later in the opinion, the ALJ further found as follows:

>> As noted above, there are multiple places where the claimant's physician failed to document a detailed physical examination of the musculoskeletal system. This lack of documentation does not support the medical necessity for the issuance of cane [sic]. By contrast, there are examinations with the physical therapist and the consultative examiner which document the claimant's ability to perform tandem walking and on heels and toes without a cane. He had negative straight leg raise tests and a notation that pain was not in a dermatomal pattern. He had normal strength and full range of motion in all extremities. No spinal tenderness and no muscle asymmetry, atrophy or acute joint findings. (Ex. 11F)

(*Id.* at 27.)

Borawski points to evidence showing his use of a cane and his stiff gait, as well as that Dr. McLoney prescribed the cane in October 2017 and gave Borawski a disability placard at the same time, and later ordered Borawski a motorized wheelchair. (Doc. No. 16 at 12.) However, Borawski does not identify any evidence that meets the standard articulated in SSR 96-9p, which requires documentation giving context for the need for a cane by describing the circumstances for which it is needed. In similar situations, multiple courts throughout this Circuit upheld ALJ decisions that did not include the need for a cane in a claimant's RFC. *See, e.g., Golden v. Berryhill*, No. 1:18CV00636, 2018 WL 7079506, at *19 (N.D. Ohio Dec. 12, 2018) ("Moreover, as [the doctor's] confirmation of a cane prescription does not indicate 'the circumstances for which [the cane] is needed,' it does not fulfill the requirements under SSR 96-9p."); *Krieger v. Comm'r of Soc. Sec.*, No. 2:18-cv-876, 2019 WL 1146356, at *6 (S.D. Ohio March 13, 2019) (finding ALJ did not err in not including a limitation for a cane where physician indicated claimant would need a cane but did not describe the specific circumstances for which a cane was needed as required by SSR 96-9p); *Salem v. Colvin*, No. 14-CV-11616, 2015 WL 12732456, at *4 (E.D. Mich. Aug. 3, 2015) (finding the ALJ did not err in not including a limitation for a cane, when it had been

prescribed, but the prescription did not "indicate the circumstances in which [the claimant] might require the use of a cane."); *Marko v. Comm'r of Soc. Sec.*, No. 2:16-cv-12204, 2017 WL 3116246, at *5 (E.D. Mich. July 21, 2017) (rejecting claimant's assertion that the ALJ failed to account for her use of a cane, stating that nothing in the physician's "mere prescription for a cane provides evidence to indicate the frequency with which the cane should be used, its purpose, or its limit upon Plaintiff's ability to perform light work" (citations omitted)). Therefore, the ALJ appropriately applied SSR 96-9p in omitting the use of a cane from his determination of RFC, and this assignment of error is without merit.[4]

Furthermore, the ALJ acknowledged record evidence regarding Borawki's use of a cane and reports that Borawski could walk without an assistive device.  (Tr. 14-16, 23-29.)  *See Forrester v. Comm'r of Soc. Sec.*, No. 2:16-cv-1156, 2017 WL 4769006, at *3 (S.D. Ohio Oct. 23, 2017) ("Unlike many cases involving the use of a cane, the ALJ did not overlook evidence concerning Plaintiff's need for the cane or fail to address this issue.") (collecting cases).  "[W]here there is conflicting evidence concerning the need for a cane, 'it is the ALJ's task, and not the Court's, to resolve conflicts in the evidence.'"  *Forrester*, 2017 WL 4769006, at *4 (citation omitted).  The same is true here.

In addition, the ALJ's reasoning regarding Borawski's need for a cane is clear from her decision. The ALJ determined she had enough evidence before her to decide whether Borawski was disabled, and therefore did not need to consider obtaining additional information.  *See* 20 C.F.R. § 404.1520b(b)(1)-(2). And while Borawski accuses the ALJ of "playing doctor," it is the ALJ's duty to evaluate and weigh the evidence.  As this district has previously explained:

> The Sixth Circuit has repeatedly upheld ALJ decisions where the ALJ rejected medical opinion testimony and determined RFC based on objective medical evidence and non-medical evidence. *See, e.g., Ford v. Comm'r of Soc. Sec.,* 114

---

[4] Even assuming, *arguendo*, the ALJ erred in omitting the use of a cane from the RFC, any such error is harmless as the VE testified that the need for a cane for walking distances greater than 100 feet and when walking on uneven terrain outdoors would not preclude Borawski's past work as a medical laboratory technician.

> F.App'x 194 (6th Cir. 2004); *Poe v. Comm'r of Soc. Sec.*, 342 Fed.Appx. 149, 2009 WL 2514058, at (6th Cir. Aug.18, 2009). "[A]n ALJ does not improperly assume the role of a medical expert by assessing the medical and non-medical evidence before rendering a residual functional capacity finding." *Poe*, 342 Fed.Appx. 149, 157.
>
> *Henderson v. Comm'r of Soc. Sec.*, 2010 U.S. Dist. LEXIS 18644, 2010 WL 750222 at * 2 (N.D. Ohio March 2, 2010). *See also Peterson*, 2017 U.S. Dist. LEXIS 9257, 2017 WL 343625 at * 3 (W.D. Mich. Jan. 24, 2017); *Thomas v. Comm'r of Soc. Sec.*, 2016 U.S. Dist. LEXIS 177371, 2016 WL 7403743 at * 3 (N.D. Ohio Dec. 22, 2016) ("There is no requirement that the ALJ's RFC finding be based on the medical opinion of a physician.") Moreover, it is well established that the claimant—and not the ALJ—has the burden to produce evidence in support of a disability claim. *See, e.g., Wilson v. Comm'r of Soc. Sec.*, 280 Fed.Appx. 456, 459 (6th Cir.2008) (citing 20 C.F.R. § 404.1512(a) ). *See also Peterson v. Comm'r of Soc. Sec.*, 2017 U.S. Dist. LEXIS 9257, 2017 WL 343625 at * 3 (W.D. Mich. Jan. 24, 2017) ("It is not the ALJ's burden to seek out medical opinions to prove or disprove a disability claim.") (citing *Brown*, 602 Fed.Appx. at 331).

*Hipp v. Comm'r. of Social Sec.*, No. 1:17-CV-0846, 2018 WL 1954361, at *9 (N.D. Ohio Apr. 5, 2018), *report and recommendation adopted by* 2018 WL 1933393 (N.D. Ohio Apr. 24, 2018).

Finally, to the extent Borawski argues an RFC finding of a range of light work is inconsistent with cane usage, this Court and other courts have rejected such an argument. *Bonette v. Comm'r of Soc. Sec.*, No. 3:16 CV 252, 2017 WL 9476853, at *13 (N.D. Ohio Feb. 2, 2017) (collecting cases).

## B.    Mental Limitations

Borawski argues the ALJ again improperly substituted her "lay opinion for that of the medical experts" by finding that Borawski's mental impairments did not result in more than minimal limitations. (Doc. No. 16 at 15-16.)  Borawski further argues, "[T]he ALJ's rationale for rejecting these opinions is illogical and repeats several of the same errors as her rejection of Plaintiff's need for a cane." (*Id.* at 16.) Borawski asserts the ALJ was required to give "good reasons" for an RFC that conflicted with the opinions of medical sources. (*Id.*)  Borawski further asserts the ALJ erred in considering the opinions *"in isolation from each other*, without acknowledging that they support each other . . . ." (*Id.*) (emphasis in original).  Borawski argues the ALJ inconsistently rejected state agency reviewing psychologist Dr.

Souder's opinion because it relied "'solely on the consultative examination, which is a one-time examination and not indicative of the claimant's long-term functioning,'" but then relied on the findings from the consultative examination to determine Borawski had no more than mild limitations in the Paragraph B criteria at Step Two. (*Id.* at 17.)

The Commissioner responds that the ALJ 'properly discounted" the opinions of the consultative examiner and the state agency reviewing psychologist "because they failed to specify the nature of Plaintiff's specific functional limitations and were at odds with the longitudinal medical evidence and Plaintiff's limited treatment history for his psychiatric complaints (Tr. 28-29)." (Doc. No. 19 at 18.) Furthermore, because these sources were not treating sources, the ALJ did not owe any deference to these opinions, nor provide "good reasons" for why she chose not to defer to them. (*Id.* at 19.) The Commissioner asserts the ALJ was not required to recontact Dr. Woodworth and Dr. Souder. (*Id.* at 21.)

At step two of the sequential evaluation, an ALJ must determine whether a claimant has a "severe" impairment. *See* 20 C.F.R. §§ 404.1520(a)(40)(ii). To determine if a claimant has a severe impairment, the ALJ must find that an impairment, or combination of impairments, significantly limits the claimant's physical or mental ability to do "basic work activities." *See* 20 C.F.R. § 404.1520(c). "An impairment ... is not severe if it does not significantly limit your physical or mental ability to do basic work activities." 20 C.F.R. § 404.1521(a). Basic work activities are defined as "the abilities and aptitudes necessary to do most jobs," and include: (1) physical functions such as standing, sitting, lifting, handling, etc.; (2) the ability to see, hear and speak; (3) understanding, carrying out, and remembering simple instructions; (4) use of judgment; (5) responding appropriately to supervision, co-workers, and usual work situations; and, (6) dealing with changes in a routine work setting. 20 C.F.R. § 404.1521(b).

The Sixth Circuit construes the Step Two severity regulation as a "*de minimis* hurdle," *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 243 n. 2 (6th Cir. 2007), intended to "screen out totally groundless

33

claims." *Farris v. Sec'y of Health & Human Servs*., 773 F.2d 85, 89 (6th Cir.1985). *See also Anthony v. Astrue*, 2008 WL 508008 at *5 (6th Cir. Feb. 22, 2008). Thus, if an impairment has "more than a minimal effect" on the claimant's ability to do basic work activities, the ALJ must treat it as "severe." SSR 96–3p, 1996 WL 374181 at *1 (July 2, 1996). However, if an ALJ makes a finding of severity as to just one impairment, the ALJ then "must consider limitations and restrictions imposed by all of an individual's impairments, even those that are not 'severe.'" SSR 96–8p, 1996 WL 374184, at *5 (July 2, 1996). This is because "[w]hile a 'not severe' impairment(s) standing alone may not significantly limit an individual's ability to do basic work activities, it may--when considered with limitations or restrictions due to other impairments--be critical to the outcome of a claim." *Id.* "For example, in combination with limitations imposed by an individual's other impairments, the limitations due to such a 'not severe' impairment may prevent an individual from performing past relevant work or may narrow the range of other work that the individual may still be able to do." *Id.*

When the ALJ considers all of a claimant's impairments in the remaining steps of the disability determination, the failure to find additional severe impairments at Step Two does "not constitute reversible error." *Maziarz v. Sec'y of Health & Human Servs.*, 837 F.2d 240, 244 (6th Cir. 1987); *see also Nejat v. Comm'r of Soc. Sec.*, 359 F. App'x 574, 577 (6th Cir. 2009). The Sixth Circuit has observed that where a claimant clears the hurdle at Step Two (*i.e.*, an ALJ finds that a claimant has established at least one severe impairment) and claimant's severe and non-severe impairments are considered at the remaining steps of the sequential analysis, "[t]he fact that some of [claimant's] impairments were not deemed to be severe at step two is . . .legally irrelevant." *Anthony v. Astrue*, 266 F. App'x 451, 457 (6th Cir. 2008).

Here, at Step Two, the ALJ found that Borawski had severe impairments of lumbar degenerative disc disease, cervical degenerative disc disease, dysfunction of a major joint, and obesity. (Tr. 18.) The

ALJ explained her determination that Borawski's depression and personality disorder were not severe as follows:

> The claimant's medically determinable mental impairments of depression and personality disorder, considered singly and in combination, do not cause more than minimal limitation in the claimant's ability to perform basic mental work activities and are therefore nonsevere.
>
> Review of the medical record shows that the claimant was taking Cymbalta for pain and mood issues (8F/4). He indicated in May 2018 that he was unsure if this medication helped his mood (13F/35). As part of the claimant's application for benefits, he was evaluated by consultative examiner Janis Woodworth, Ph.D., on November 28, 2017 (l0F). The claimant reported that he was hospitalized for psychiatric reasons in 2001 but his own mental health treatment was an intensive outpatient program in 2012 (l0F/4). He described having problems with irritability, sadness, hopelessness, low energy and motivation, and not caring if he lives or dies (l0F/5). Dr. Woodworth's report shows that the claimant had dysthymic mood with blunted affect, but he also could recall 3 out of 3 objects after a brief delay (l0F/6). He could perform serial 7s and serial 3s, recite 6 digits forward and 4 digits backwards (l0F/6). Dr. Woodworth assessed that the claimant had persistent depressive disorder, despite never seeking treatment or complaining of ongoing symptoms, and other specified personality disorder (l0F/6-7). Other evidence in the medical record shows that the claimant went to four mental health sessions at the request of his physician (15F). While he complained of ongoing depression, the claimant's mood, affect, and behavior were assessed as normal or depressed (13F/38; 15F/16, 35, 43). He was diagnosed with major depressive disorder, moderate, and prescribed Wellbutrin XL (15F/36).
>
> In making this finding, the undersigned has considered the four broad areas of mental functioning set out in the disability regulations for evaluating mental disorders and in the Listing of Impairments (20 CFR, Part 404, Subpart P, Appendix 1). These four areas of mental functioning are known as the "paragraph B" criteria.
>
> The first functional area is understanding, remembering, or applying information. In this area, the claimant has a mild limitation. In an Adult Function Report, the claimant indicated that he has a hard time with memory, understanding, following instructions and completing tasks (6E/7). He also stated that he can follow simple written instructions (6E/7). During a consultative examination, although the claimant had dysthymic mood with blunted affect, he recalled all 3 out of 3 objects after a brief delay (l0F/6). He could perform serial 7s and serial 3s, recite 6 digits forward and 4 digits backwards (l0F/6). The consultative examination also estimated the claimant's intellectual functioning to be in the average range (l0F/6). Review of the medical record shows that the claimant's memory was within normal limits (15F/8). Considering the totality of the

evidence, the undersigned finds that the claimant would be no more than mildly limited in his ability to understand, remember, or apply information.

The next functional area is interacting with others. In this area, the claimant has a mild limitation. In an Adult Function Report, the claimant indicated that he does not socialize with another and he has no family or friends (6E/6). He indicated that he has problems getting along with others and wrote some derogatory words about being against the world (6F/7). He also stated that he has zero tolerance for other people (6E/8). During a consultative examination, the claimant indicated that he does not socialize and has no family involvement (l0F/5). The claimant has reported difficulties in past jobs getting along with coworkers and supervisors (l0F/7). However, a review of the medical treatment record does not demonstrate difficulties interacting with medical care providers, answering questions during the hearing process or having any legal problems. Therefore, the undersigned finds that the claimant's statements are not sufficient by themselves to support a finding of more than only mild limitations in his ability to interact with others.

The third functional area is concentrating, persisting, or maintaining pace. In this area, the claimant has a mild limitation. In an Adult Function Report, the claimant indicated that he has problems completing tasks, concentrating, and following instructions (6E/7). During a consultative examination, despite the claimant's dysthymic mood with blunted affect, he was able to concentrate and persist adequately to perform mathematical computations. For example, he recalled a perfect 3 out of 3 objects after a brief delay; he performed serial 7s and serial 3s; and he recited 6 digits forward and 4 digits backwards (l0F/6). Mental status examinations performed by treating providers indicate the claimant has "sustained" attention span and concentration. (15F/8, 43). On occasion, his attention is considered "impaired;" but, still he retained cooperative behavior, logical and organized thought processes with no evidence of paranoia, delusions, ideations or perceptual disturbances. (15F/35). Considering the totality of the evidence, the undersigned finds that the claimant would be only mildly limited in his ability to concentrate, persist or maintain pace.

The fourth functional area is adapting or managing oneself. In this area, the claimant has a mild limitation. 0n an Adult Function Report, the claimant indicated that he has no problems remembering to take his medication or perform self-care (6E/4). He can cook simple meals, use a riding lawnmower to do yardwork, drive a car and go shopping (6E/4-5). During a consultative examination, the claimant indicated that he was able to dress, bathe, do laundry, shop, and manage money independently (l0F/5). Considering the totality of the evidence, the undersigned finds that the claimant would be only mildly limited in his ability to adapt or manage himself.

Because the claimant's medically determinable mental impairments cause no more than "mild" limitation in any of the functional areas, they are nonsevere (20 CFR 404. l 520a(d)(l)).

(*Id.* at 19-20.)

The ALJ considered the four functional areas, found Borawski had only mild limitations in each (with citations to the record in support), and concluded his mental impairments were non-severe. (*Id.*) Contrary to Borawski's assertion, the ALJ relied on other evidence – including Borawski's own reports – to find his mental impairments non-severe; she did not just rely on the consultative examiner's report. (*Id.*) Borawski fails to identify any contrary lines of evidence the ALJ ignored or overlooked. (*See* Doc. No. 16 at 15-19.) Nor does Borawski argue that the ALJ failed to consider his non-severe mental impairments in determining his RFC. (*Id.*) The Court's review of the ALJ's decision reveals that the ALJ considered Borawski's severe and non-severe impairments in her RFC analysis. (Tr. 28-30.) Therefore, even if the ALJ erred at Step Two, such error was harmless. *Maziarz*, 837 F.2d at 244; *Nejat*, 359 F. App'x at 577; *Anthony*, 266 F. App'x at 457.

Borawski also challenges the weight the ALJ assigned to the opinions of consultative examiner Dr. Woodworth and state agency reviewing psychologist Dr. Souder. The ALJ weighed and analyzed these opinions as follows:

> The undersigned accords little weight to the opinion of the State agency psychiatric medical consultant Janet Souder, Psy.D. On reconsideration, Dr. Souder opined that the claimant had moderate limitations in interacting with others and adapting or managing himself, but he had no limitations in the other areas of mental functioning (3A). The undersigned accords little weight to these opinions for the following reasons. First, Dr. Souder appeared to rely solely on the consultative examination, which is a one-time examination and not indicative of the claimant's long-term functioning to judge the claimant's mental capabilities. Second, the medical evidence of record shows very limited treatment for and symptoms of mental impairments (l5F). Specifically, the record shows only 4 mental health treatment sessions, which were ordered by the claimant's spine physician (15F). Treatment notes from these sessions showed sporadic issues with concentration and attention, as detailed above, but still capable of retaining logical thought processes, maintaining a cooperative demeanor, no delusions, hallucinations or disturbances in perceptions and being oriented in all spheres (l5F). She failed to support or explain why the claimant should be limited to infrequent superficial interactions. She was also vague and imprecise in stating her limitations. For example, she said the claimant had

"reduced tolerance for responding to work pressures and stressors," but did not quantify the reduction or explain how that would impact work function.

\* \* \*

The undersigned accords some weight to the opinion of consultative examiner Janis Woodworth, Ph.D. (l0F). On November 28, 2017, Dr. Woodworth opined should have no difficulty in understanding, remembering or carrying out instructions and maintaining attention, concentration, persistence and pace to perform simple and multistep tasks or in interacting with others (l0F/8-9). Dr. Woodworth also opined that the claimant's symptoms of depression "may interfere" in responding appropriately to work pressures (l0F/9). The undersigned accords this opinion some weight for the following reasons. First, Dr. Woodworth used vague and imprecise terminology to express her opinion that the claimant is not limited from a mental health standpoint. The inappropriate standard and quantifier used by her was" should have no more difficulty than same aged peers." Second, Dr. Woodworth did not adequately explain or provide a quantifying limit regarding work pressure, and instead said "symptoms of depression may interfere with ability to respond to work pressures." Dr. Woodworth failed to state which symptoms would interfere, and the phrase "may interfere" is insufficient for the undersigned to rely on to find the claimant limited. (15F).

(Tr. 28-29.)

As non-treating sources, the ALJ owed no deference to the opinions of Drs. Woodworth and Souder.  An ALJ is not required to give "good reasons" for rejecting a non-treating or non-examining opinion.  *Ackles v. Comm'r of Soc. Sec.*, 470 F. Supp. 3d 744, 753 (N.D. Ohio 2018) (citation omitted).  Furthermore, an ALJ is entitled to credit some parts of an opinion while rejecting other parts of it.  *Black v. Comm'r of Soc. Sec.*, No. 5:11CV2770, 2012 WL 4506018, at \*9 (N.D. Ohio Sept. 28, 2012) (citing *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006)).  Finally, an ALJ may assign less weight to an opinion for vagueness.  *Ackles*, 470 F. Supp. 3d at 747 (citations omitted).

The ALJ considered and weighed the medical opinion evidence of record and provided an explanation for the weight assigned.  The ALJ determined that parts of Dr. Woodworth's and Dr. Souder's opinions were vague and assigned less weight to those opinions as a result.  (Tr. 28-29.)  The ALJ was not required to recontact Dr. Woodworth or Dr. Souder in rejecting part of their opinions as vague.  *Ackles*,

470 F. Supp. 3d at 754-55 (citing *Dooley v. Comm'r of Soc. Sec.*, 656 F. App'x 113, 122 (6th Cir. 2016)). It is the ALJ's duty, not this Court's, to weigh the evidence and resolve any conflicts, and she did so here.

Although Borawski cites evidence from the record he believes supports a more restrictive RFC, the findings of the ALJ "are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion." *Buxton v. Halter*, 246 F.3d 762, 772-73 (6th Cir. 2001). Indeed, the Sixth Circuit has made clear that an ALJ's decision "cannot be overturned if substantial evidence, or even a preponderance of the evidence, supports the claimant's position, so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). The ALJ clearly articulated her reasons for finding Borawski capable of performing work as set forth in the RFC and these reasons are supported by substantial evidence. There is no error.

## VII.  CONCLUSION

For the foregoing reasons, the Commissioner's final decision is AFFIRMED.

**IT IS SO ORDERED.**

Date:  March 3, 2021                                      *s/ Jonathan Greenberg*
                                                                    Jonathan D. Greenberg
                                                                    United States Magistrate Judge